UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

SEP 26  11 20 AM '00

US DIS
U.S.
MASS

UNITED STATES OF AMERICA,

      Plaintiff,

        v.

THE PRESIDENT AND FELLOWS
OF HARVARD COLLEGE,
ANDREI SHLEIFER,
JONATHAN HAY,
NANCY ZIMMERMAN, and
ELIZABETH HEBERT,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

**00 CV 1 1 9 7 7 DPW**

RECEIPT #   N/A
AMOUNT #   N/A
          YES

Eric Schleyes
4/26/00

## COMPLAINT AND JURY TRIAL DEMAND

### I.  INTRODUCTION

1.  The United States alleges that Harvard University ("the President and Fellows of Harvard College" or "Harvard") and its employees, Andrei Shleifer and Jonathan Hay, defrauded the United States out of at least $40 million dollars paid to Harvard to provide impartial and unbiased advice in connection with a United States' assistance program in Russia.  The United States alleges that Shleifer and Hay abused their positions as high-level and trusted advisors to and on behalf of the United States in Russia, and misused resources funded by the United States for their own personal benefit and the personal benefit of their wives, girlfriends and/or business associates.  Harvard, which was paid by the United States to provide impartial and unbiased



administration and oversight of the assistance program in Russia, failed in its obligation to provide such oversight, and instead mismanaged and abused the resources entrusted to it by the United States.   As a result of Defendants' misconduct, the United States suspended and ultimately terminated the Harvard project in Russia.

2.   The United States alleges that Defendants' actions undercut the fundamental purpose of the United States' program in Russia -- the creation of trust and confidence in the emerging Russian financial markets and the promotion of openness, transparency, the rule of law, and fair play in the development of the Russian economy and laws.

3.   During the course of the Harvard project in Russia, Defendants submitted and/or caused to be submitted to the United States false and/or fraudulent bills and other statements.   These bills and statements falsely and/or fraudulently represented that Harvard, Shleifer, Hay and others under their direction were providing impartial, unbiased advice pursuant to policies which forbade investments in Russia, and that Harvard was providing services in accordance with the terms and conditions of its agreements with the United States.

4.   The United States paid at least $40 million to Harvard because of Defendants' false and/or fraudulent representations that Harvard, Shleifer and Hay were providing services which were free from bias and in accordance with the agreements between the

2

parties.   The United States also paid at least $350 million to other contractors under the oversight and supervision of Harvard.

## II. JURISDICTION

5.    This is an action for diversion of money paid under a federal grant program, including claims for false claims, fraud, and breaches of fiduciary duty.   The case arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq., equitable principles and common law.   This Court has jurisdiction pursuant to 28 U.S.C. § 1345.

## III.   VENUE

6.    Venue lies in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a), as the place where one or more of Defendants reside and where a substantial part of the events or omissions giving rise to the claim occurred.

## IV.   PARTIES

7.    Plaintiff is the United States of America on behalf of its agency, the United States Agency for International Development ("USAID").

8.    Defendant Harvard is a non-profit corporation with a principal place of business in Cambridge, Massachusetts.   Its operations at all relevant times included the Harvard Institute for International Development ("HIID"), which implemented Harvard's contracts with the United States to assist developing countries such as Russia.   HIID is a part of Harvard and not a

3

legally distinct corporate entity.

9.   Defendant Andrei Shleifer ("Shleifer") is an individual now residing in Newton, Massachusetts.  At all relevant times, Shleifer was and is a tenured Professor of Economics at Harvard and a full-time Harvard employee.  Shleifer was the Principal Investigator and Project Director for USAID funded agreements with Harvard for work on economic and legal reforms in Russia (the "Project").  As such, he had primary responsibility for proper management of the Project, as well as the obligation to insure adherence to all terms and conditions of the agreements with USAID.  During at least some periods of time, including the summers of 1993 and 1994, as well as from July 1, 1995 through August 31, 1996, Shleifer requested that he be "employed" under the Cooperative Agreements, and during those periods was paid by Harvard and billed by Harvard to USAID as a full-time employee on the Project.

10.   Defendant Jonathan Hay ("Hay") is an American citizen now residing in Moscow, Russia.  From approximately 1992 to May 1997, Hay was a Harvard employee serving as Harvard's Moscow-based representative (General Director) in charge of the Project.  Hay managed Harvard's USAID funded operations in Russia and oversaw the activities of many USAID funded consultants to the Russian government.  Hay reported directly to Shleifer.

11.   At all relevant times, in connection with their actions

4

related to the Project, Shleifer and Hay were acting within the scope of their authority and/or their apparent authority based upon their positions at Harvard.

12. Defendant Nancy Zimmerman ("Zimmerman") is an individual residing in Newton, Massachusetts. At all relevant times, she was and is married to Defendant Shleifer. Beginning in June 1994, Zimmerman operated an investment fund management company known as Farallon Fixed Income Associates ("FFIA") in Cambridge, Massachusetts. FFIA was a joint venture between Fixed Income Associates ("FIA"), a company owned by Nancy Zimmerman, and Farallon Capital Management, Inc. ("Farallon Capital"), a separate San Francisco based company which is associated with a number of investment funds and partnerships bearing the Farallon name. Both individually and through FFIA, Zimmerman was involved in a number of investments and financial transactions in Russia and utilized the USAID funded staff and resources of the Harvard project to assist her with these investments.

13. Defendant Elizabeth Hebert ("Hebert") is an American citizen now residing in Moscow, Russia. She is married to Defendant Hay, and has been together with him in a close personal relationship since at least December 1995. She is the founder and manager of Pallada Asset Management ("Pallada"), the Russian mutual fund management company which received the first license to operate a mutual fund in Russia.

## V. FACTUAL BACKGROUND

14.   After the Soviet Union dissolved in December 1991, the
United States began providing limited assistance to support reform
efforts in the states of the former Soviet Union.   In October
1992, Congress enacted the Freedom for Russia and the Emerging
Eurasian Democracies and Open Market Support Act of 1992.   22
U.S.C. §§ 5801 et seq.   This Act authorized a program, to be
implemented primarily by USAID, to help the states of the former
Soviet Union carry out political and economic reform in support of
open markets, including "establishment of transparency in
regulatory and other governmental decision making."   22 U.S.C. §
5811(6)(B).   USAID sought to accomplish the task, in part, through
two Cooperative Agreements with Harvard.

A.   The Cooperative Agreements

15.   In December 1992, USAID and Harvard entered into the
first Cooperative Agreement, pursuant to which Harvard agreed to
provide advisory teams to assist Russia in efforts to privatize
assets held by the government.   The scope of this Cooperative
Agreement was later expanded to provide support for legal reform
and capital market initiatives.   The Cooperative Agreement stated
that "HIID's role in the project is unique in that it...
operate[s] in a supervisory and regulatory capacity to the overall
project."   The Cooperative Agreement included a component for

6

Harvard to assist in developing laws and regulations to "ensure
competition, transparency and fair play" in, among other things,
the development of the securities market.

16.  Harvard signed a second Cooperative Agreement with USAID
in October 1995, entitled "Impartial Oversight and Strategic
Guidance for Privatization and Market Reform Programs in Russia."
Harvard's role was to provide strategic guidance to the capital
market development effort.  This guidance included coordination
and impartial oversight over various contractors engaged by USAID
to provide assistance to Russian institutions.  The Agreement
stated: "The ultimate success of these programs is of the utmost
importance to USAID and to the Government of Russia."  It also
provided that Harvard "shall provide unbiased input to, and
overall day-to-day management, review and evaluation of, the
privatization and market reform programs."  The Agreement further
provided that the "recipient must develop the complete confidence
and trust of the host government and also the array of donor
agencies" and that "a completely neutral third party, void of any
vested interest in the contracting process, is required."

17.  In implementing these Cooperative Agreements, Harvard,
Shleifer and Hay undertook to act on behalf of the United States
in overseeing a program to provide advice to Russia, to act as
advisor to USAID on what policies to pursue, and to assist in
managing the privatization and post-privatization assistance

effort in Russia.  By virtue of these undertakings, Harvard,
Shleifer and Hay owed fiduciary duties, including a duty of
loyalty and utmost good faith, to the United States.  These duties
included the duty not to engage in any conduct which could result
in conflicts of interest, and to disclose any financial interests
they had in the matters within the scope of their advice and
management.

18.  Harvard, Shleifer and Hay understood that they had
undertaken to implement the United States' strategic goals in
Russia and to act on behalf of USAID.  For example, in its First
Quarter 1995 Performance Report to USAID, Harvard stated: "In the
first quarter of 1995, Professor Andrei Shleifer of Harvard
University continued to direct technical assistance on behalf of
the U.S. Agency for International Development through a
Cooperative Agreement with HIID."

19.  Similarly, in the 1996 Workplan submitted to USAID,
Harvard stated: "At all times, HIID will emphasize the strategic
policy objectives of the U.S. government."

20.  Shleifer himself explained the significance of this work
to the United States.  In his 1995 book, Shleifer wrote:

> Western governments give aid to Russia not because they
> are charitable, but because their own national security
> interests demand a stable and peaceful transition from
> communism.  Economic aid to Russia is probably the least
> expensive and most effective form of defense spending by
> either the United States or Western Europe.

Maxim Boycko, Andrei Shleifer and Robert Vishny, <u>Privatizing</u>

8

<u>Russia</u> 142-43 (1995).

    B.   <u>Specific Conflict of Interest Prohibitions</u>

    21.   In addition to the prohibitions against investing in
Russian markets which were inherent in their positions, Shleifer
and Hay were subject to government contract provisions, government
regulations and internal Harvard policies concerning impartial and
unbiased advice and conflicts of interest.   For example, employees
of the grantee, Harvard, were prohibited by the specific terms of
the Cooperative Agreements from investing in a country in which
they were assigned work.   Both Cooperative Agreements provided:

> [N]o employee of the grantee shall engage directly or
> indirectly, either in the individual's own name or in
> the name of or through an agency of another person, in
> any business, profession, or occupation in the foreign
> countries to which the individual is assigned, nor shall
> the individual make loans or investments to or in any
> business, profession or occupation in the foreign
> countries to which the individual is assigned.

    22.   This Agreement also provided that any violation of the
policy had to be reported by Harvard to USAID.

    23.   In addition, the Cooperative Agreements incorporated 22
C.F.R. § 226.42 or its similar predecessor provision.   22 C.F.R. §
226.42 provides:

> [T]he recipient shall maintain a code of standards of
> conduct that shall govern the performance of its
> officers, employees or agents in the awarding and
> administration of contracts using AID funds.   Conflict
> of interest situations involving employees, officers or
> agents or their immediate families shall be avoided.
> The recipients' officers, employees or agents shall
> neither solicit nor accept gratuities, favors or
> anything of monetary value from contractors or potential

contractors.

24.   HIID's Overseas Manual, which was provided to USAID, also contained a conflict of interest policy which restricted the activity of HIID employees and members of their families when conducting work in other countries.   It provided:

> HIID employees and members of their families may engage in no financial transactions or investments within the Project Country ....   Such transactions or investments include maintenance of savings accounts or the purchase of savings certificates, holding of debt instruments, maintaining any interest whatsoever in any local business, or making investments of any kind in the Project Country.

25.   Harvard's Faculty of Arts and Sciences, of which Shleifer was a member, also had a conflict of interest policy which required the disclosure of potential conflicts of interest, including any relationship "that might enable a member to influence Harvard's dealings with an outside organization in any way leading to personal gain or to improper advantage for anyone."

26.   In its June 1995 submission to USAID in connection with its proposal for the second Cooperative Agreement, Harvard included a required Conflict of Interest Statement, which stated:

> As a non-profit, academic institution, Harvard is committed to maintaining an objective and unbiased role.... In substance and principle, HIID already provides impartial oversight under its current Cooperative Agreement.

C.   The Investments

27.   While they were acting on behalf of USAID and under the restrictions described above, Shleifer and Hay, along with

Zimmerman and Hebert, engaged in at least the following investments and businesses in Russia in areas that were within the scope of their economic and legal advice on behalf of USAID:

(i) In 1994, Shleifer and his wife Zimmerman invested $200,000 through Renova-Invest, a United States/Russian investment entity, in various Russian companies, including an aluminum company for which Hay and others funded by USAID later provided legal services.  Through Renova-Invest, Shleifer and Zimmerman also invested $60,000 in Russian government debt ("GKO's");

(ii) Also in 1994, Shleifer, Zimmerman and Hay purchased several hundred thousand dollars worth of shares in Russian oil companies and had the shares registered in the name of Shleifer's father-in-law;

(iii) Hay, Zimmerman, Hebert and Shleifer participated in the launching and financing of (i) Russia's first licensed mutual fund, which was started by a company (Pallada) founded and managed by Hay's then girlfriend (now wife) Hebert, and/or (ii) Russia's first licensed mutual fund depository, the First Russian Specialized Depository ("FRSD"), which was started by Hebert's business partner, Julia Zagachin;

(iv) Hay and Hebert participated in creating a real estate advisory/property management firm to work with Hebert in starting a real estate mutual fund, and to lease properties to and manage properties for a project to which Hay was a key advisor; and

(v) Hay assisted Zimmerman in her efforts to trade short term Russian government bonds ("GKO's") and other government debt and repatriate the profits from such trades without paying the required Russian repatriation tax, and used USAID funded staff and offices to set up and operate a Russian trading company to implement this scheme.

(i)   Shleifer's and Zimmerman's Investment in Russian Stocks Via Renova-Invest

28.   On July 13, 1994, at a time when he was being paid for full-time work on the Project with USAID funds, Shleifer and his

wife made a $200,000 investment in Russian stocks through a
company known as Renova-Invest ("Renova"), a United States/Russian
investment group.

29.  Specifically, in a July 13, 1994 letter, Shleifer agreed
to invest $200,000 in Russian securities through Renova.  On the
same date, $200,000 was wired to Renova from an account of
Zimmerman.

30.  The stocks purchased through Renova included many of
the major Russian companies which had been and were being
privatized under plans for which Shleifer was a key advisor.
These companies included Rostelcom, Gazprom, Irkaz, Sayansk,
Bratsk, Vladimir Tractor and Chernogoroneft.

31. In addition, in 1995, $60,000 of these funds and/or the
proceeds from sale of these stocks were invested in GKO's (short
term government bonds) at a time when Shleifer, while being funded
by USAID, was involved in advising the Russian government on debt
policy and negotiations with the International Monetary Fund
concerning further extensions of credit to the Russian government.

32.  Following these investments, USAID funds were used for
the benefit of the companies in which Shleifer and his wife
Zimmerman had invested.  In 1995, Renova's Russian affiliate
needed legal counsel in Russia to assist it in vertically merging
aluminum companies, including Irkaz, one of the companies whose
stock Renova had purchased for Shleifer.  Based upon Shleifer's

12

recommendation, Renova hired Hay and other USAID funded staff
working with Hay to perform these legal services.

33.  Hay worked on the merger documents himself, and used
several USAID funded lawyers to work on the transaction.  The time
spent by these lawyers working on this private merger was charged
to USAID.

34.  In addition, Harvard's USAID funded projects provided
direct assistance to other companies in which Shleifer had
invested through Renova.  Moreover, much of Harvard's work on
privatization and post-privatization issues such as market
development, taxation, budget, and competition policy had at least
a potential impact on the value of stock in these major Russian
companies.

### (ii) Shleifer and Hay's Oil Stock Purchases With Farallon Capital and CentreInvest

35.  Also in July 1994, Shleifer and Farallon Capital agreed
to purchase oil stocks in Russia.  They agreed that for each
purchase, Shleifer would invest 10% of the funds and Farallon-
related entities would invest 90% of the funds.

36.  Although Shleifer agreed to invest his own capital in
these oil stocks, he arranged for his investment in these stocks
to be concealed by having them held in the name of another.  At
first this was to be Zimmerman, but the shares were ultimately
registered in the name of Zimmerman's father.

37.  Thus, Shleifer wrote, in the first of two memoranda

13

dated July 28, 1994:

> The initial investment is anticipated to be $2 million,
> with increase to $5 million if sufficient investment
> opportunities are available. Andrei will invest 10
> percent as his own capital, with shares to be registered
> to Nancy Zimmerman.

Then, in a second July 28, 1994 memorandum, Shleifer changed this

language to "Shleifer will invest 10 percent as his own capital,

with shares to be owned by Nancy Zimmerman."

38.  True and accurate copies of the first and second July

28, 1994 memoranda described above are attached as Exhibit A and

Exhibit B respectively.

39.  Farallon Capital and Shleifer made three sets of

purchases of oil stocks through CentreInvest in the late summer

and fall of 1994.  In each instance, 90% of the shares were

purchased in the name of Farallon-related funds, and 10% were

purchased in the name of Shleifer's father-in-law, with all or

some of the funds for Shleifer's 10% coming from Shleifer, Nancy

Zimmerman and Hay, as set forth below:

(A)  On August 11, 1994, Shleifer wired $165,000 from his
joint checking account with Nancy Zimmerman to a Channel
Islands bank for the purchase of 30,000 shares of the
Russian oil company Purneftegas.

(B)  On August 31, 1994, Shleifer sent a $99,000 check from
his own money market account to his father-in-law, who
in turn wired $165,000 to a Channel Islands account for
the purchase of 5,000 shares of the Russian oil company
Yuganskneftegas.

(C)  On September 20, 1994, Shleifer deposited a $66,000
check from Hay to Shleifer into Shleifer's individual
account.  At that time, there was approximately $3,000

14

in Shleifer's account.  Shleifer deposited an additional approximately $6,000 in the account.  No other funds were deposited in that account prior to November 4, 1994.  On November 4, 1994, Shleifer wired $19,000 from this account to a Channel Islands account for the purchase of 1,000 shares of stock of the Russian oil company Varieganneftegas.

40.  Out of the $19,000 wired by Shleifer to purchase the Varieganneftegas shares on November 4, 1994, a minimum of slightly less than $10,000 of Hay's funds was used.

41.  Nonetheless, approximately five months after the USAID investigation into these matters began, in August 1997, Shleifer sent a $66,000 check to Hay's father with a note claiming that he had not been able to put the funds to any "good use."  Although Shleifer had the use of his subordinate's funds for almost three years, he paid no interest on the $66,000 to Hay.

42.  Just before these oil stock purchases began, Hay directed a USAID funded Harvard employee to do research on the price of Russian stocks, including specifically gathering price quotes on Russian oil stocks and reporting those to Hay in a written memorandum.  Hay also used another USAID funded employee and a USAID funded contractor to have these oil stock purchases confirmed in the Russian registries of the companies purchased.

(iii)    Involvement in the First Russian Specialized Depository and Pallada Asset Management

43.  Beginning in late 1995 or early 1996, Hay, Hebert, Shleifer, Zimmerman, and USAID funded Harvard employee Julia Zagachin, put together, promoted and/or financed a plan to launch

the first Russian mutual fund management company ("Pallada") and
the first Russian specialized depository ("FRSD").   These
businesses were predicted to be quite profitable and both required
licenses from the Russian Securities Commission, an entity which
Harvard, Shleifer and Hay helped establish and to which Harvard,
Shleifer and Hay were key advisors.  Both Pallada and the FRSD
received the first operating license of their kind ever issued by
the Russian Securities Commission.

        44.    Hay actively solicited investments in Pallada and the
FRSD from Zimmerman, the Farallon companies and others.  Hay
traveled to Boston to participate in some of the meetings with
representatives of at least one potential investor, Aldrich,
Eastman & Waltch and/or its affiliates ("AEW").

        45.    On or about March 29, 1996, Hebert sent to AEW affiliate
Commonwealth Property Investors ("CPI") a business plan (the
"Business Plan") to create a Russian domestic fund management
company to launch one of the first mutual funds in Russia.  The
Business Plan for what was to become Pallada and the FRSD sought
investors to contribute $3.5 million in exchange for 30% of the
equity of the proposed company.  The Business Plan predicted that
the company would generate $28 million annually in pre-tax profits
in the first five years of operation.  It stated that the
management team would "consist of a Chief Executive Officer,
Elizabeth Hebert, and a Chief Operating Officer, Julia Zagachin."

                                  16

At the time, Zagachin was being paid as a full-time employee of
Harvard on the USAID funded Project under Hay's supervision, while
in fact working on starting this private mutual fund and/or
depository business with Hebert.

46.  Hebert and Zagachin planned to use their close
relationship with the Russian Securities Commission to which Hay
was a key advisor to gain a competitive advantage over other
funds.  The Business Plan stated:

> The timing is critical to ensure the Fund is able to
> benefit from expected barriers to entry, the first of
> which is an untested licensing procedure for the fund
> management company.  ...  It is expected that the fact
> that the team is well known to and trusted by the
> regulators suggests that it will be able to facilitate
> the issuance of licenses and clear other regulatory
> hurdles which are expected to be a hindrance to
> competitors.

47.  Hebert also indicated that she and Zagachin intended to
use the services of the Institute for Law-Based Economy ("ILBE"),
a Russian affiliate of the Harvard Project under the direction of
Hay and largely funded by USAID.  The Business Plan stated:

> [I]t will also be important to develop solutions in
> close co-operation with the Federal Commission which
> intends to carefully regulate these functions. ...  To
> ensure full compliance the Institute for Law-Based
> Economy (the Russian non-profit that drafted the
> Regulations) has already been retained to provide advice
> in the consideration of various options and to
> facilitate the development of those options where
> regulatory assistance is required.

48.  In a May 20, 1996 memorandum, Hay solicited investments
in the proposed mutual fund depository business.  Attached as

17

Exhibit C is a true and accurate copy of the memorandum from Hay
to Zimmerman, except that the handwritten notes thereon were added
by Zimmerman.   This memorandum was faxed from Hay's office to the
office of Zimmerman.

49.   In this solicitation memorandum, Hay stated that "we"
are seeking an investment of $1.2 million in the FRSD.   In the
memorandum, Hay noted that the regulations governing mutual funds
"were drafted by the Russian legal team that I manage."   He touted
the likely success of the investment based primarily on its close
relationship with the Russian Securities Commission, and
specifically stated that "we are likely to get a license before
anyone else which will give a significant first mover advantage."
Hay also stated: "Given this project's relationship to the Federal
Commission, any other attempts by definition will be in a catch up
mode."

50. In this memorandum, Hay described the proposed mutual
fund management company as part of a package together with the
proposed mutual fund depository (which was actually supposed to
act as an independent watchdog with respect to such mutual fund
management companies).   Hay stated:   "We are not interested in
your investment in the Specialized Depository unless this is
helpful to raise the funds needed to start the Fund Management
Company [being created by Hay's girlfriend Hebert]" because, among
other things "we frankly want to start both of these things at the

18

same time and are tying our futures to this strategy."

51.   In the memorandum, Hay also stressed the expected profitability of the business.  The memorandum stated:

[I]f we were to assume that this Specialized Depository has a large market share and that it were to process millions of accounts, it would be an extremely profitable operation!  We are certainly well positioned to achieve such success if Yeltsin wins the election and the mutual fund industry booms in Russia (and we expect both of these things to happen).

52.   Beginning at least in early 1996, Zimmerman and/or Shleifer planned to invest in Pallada and/or the FRSD.  Zimmerman planned to be the lead investor, assisted in the structuring of the transactions, and solicited others to participate with her in the investments, including AEW and/or its affiliates.  Shleifer had knowledge of at least some of these plans and attended at least one meeting with AEW representatives where AEW's and Zimmerman's potential investments in Pallada and the FRSD were discussed.  He and Zimmerman also traveled to Moscow to meet with Zagachin, Hebert and Hay concerning these plans and investments, and contributed funds for the financing of Pallada, as set forth in greater detail below.

53.   On or about May 1, 1996, Zimmerman wrote a memorandum to Hebert and Zagachin in which Zimmerman stated that her "investor group is interested in acquiring 49% of the depository in exchange for $600,000.00 in equity investment.  The investor group would also put up $600,000.00 in exchange for 20% of the

19

mutual fund management company."

54.  On or about June 9, 1996, Shleifer wrote a memorandum
to Hay marked "Strictly Confidential" which stated: "Nancy and I
had a long talk.  We are meeting with AEW on Tuesday PM. ..."
On the following Tuesday, June 11, 1996, Shleifer participated in
a meeting with Nancy Zimmerman and AEW representatives concerning
the proposed investment by AEW and Zimmerman in the depository and
mutual fund management company businesses being launched by
Hebert, Hay and/or Zagachin.

55.  On August 16, 1996, the Russian Securities Commission to
which Shleifer and Hay were advisors modified the specialized
depository regulations to, among other things, permit a waiver of
the requirement for the manager of such a specialized depository
to have prior experience in investment funds.  This modification
enabled Zagachin, who did not have such experience, to be such a
manager of the FRSD.

56.  On or about August 19, 1996, Shleifer and Zimmerman
visited Moscow and had a closed door meeting with Zagachin, Hay
and Hebert.  Approximately one week later, on August 27, 1996,
$400,000, including $200,000 which came from Jonathan Hay's
account, was wired from the account of Jonathan Hay's father to
Oasis Financial Services ("Oasis"), Zagachin's holding company for
the FRSD.

57.  On September 3, 1996, the $400,000 which had been

transferred to Oasis by Jonathan Hay's father was used to purchase
the FRSD for Julia Zagachin's company (Oasis) from the prior
owner.

58.   From that time until the time this USAID investigation
began in April 1997, Hay and his father provided the $400,000 of
required minimum capitalization for the FRSD.   At the same time,
Hay continued to supervise regulations relating to FRSD, and to
direct technical assistance funded under separate contracts by
both USAID and the World Bank to the benefit of the FRSD.   When
Zagachin and Hay learned about the USAID investigation in late
March or early April 1997, the money was quickly repaid to Hay and
his father.

59.   Although Hay and his father transferred the $400,000 to
Julia Zagachin's company, Oasis, directly, the transaction was
documented as a loan from Hay's father to Hebert, a loan from
Hebert to Zagachin, and a loan from Zagachin to Oasis.

60.   Zimmerman and Shleifer provided funding and/or
capitalization for Pallada as follows:

(a)   In or about November 1996, Zimmerman invested
approximately $500,000 of her company's funds through
the first mutual fund created by Pallada.   Shortly after
the USAID investigation began, in May 1997, the
remaining funds and profits thereon were repaid to
Zimmerman's company.

(b)   On February 25, 1997, Shleifer wired $200,000 from his
and Zimmerman's joint account for the benefit of
Pallada.   He wired approximately one third to Pallada's
landlord and the other two thirds to Boston Capital
Management, the holding company for Pallada.

21

61.   The statutes and regulations governing the creation of the Russian Securities Commission and the creation and licensing of these mutual funds and depositories were, to a significant extent, drafted by or in coordination with the USAID funded team under the direction of Hay and Shleifer, which Hay described as the "Russian legal team that I manage."

62.   In addition, during the same time period in which Shleifer wired his and his wife's funds to Pallada's holding company and Hay and his father's funds were financing the FRSD, Shleifer and Hay worked on matters pursuant to the Cooperative Agreements relating to capital markets, including specifically the tax treatment of mutual funds.

63.   On or about February 26, 1997, just a day after he wired the funds to Pallada, and at a time when the tax experts on the Project had clashed with Hay over capital markets taxation, Shleifer threatened to ostracize the chief tax expert.   In particular, Shleifer threatened to ensure that expert's group would be ineffective in Russia if that expert accepted USAID funding for a Russian tax project independent of Shleifer and Harvard.

(iv)   Hay's Creation of a Private Real Estate Firm

64.   Beginning in the spring of 1996, while still employed full-time on the USAID funded Harvard Project, Hay worked together with Hebert and certain USAID and World Bank funded employees

22

under his direction to start a real estate development and/or
property management business.  This business was to team up with
Hebert's mutual fund company and CPI to create a real estate
mutual fund and to develop and manage real properties in Russia.

65.  As part of this plan, Hay was to deliver a public
program to which he was an advisor as an anchor tenant for some of
the properties his proposed private group would help develop.
Hay's private group was to receive a portion of the profit from
the rents paid by the public program.

66.  In furtherance of this plan, on April 19, 1996, Hay
faxed a memorandum to the CPI regarding the "Draft Terms of
Agreement", in which Hay confirmed his proposal to "put together a
small team ... which would include myself ... to provide real
estate services to CPI."  Hay proposed to "form an entity jointly
with CPI ... that would have the goal of purchasing, developing
and managing real estate projects in Russia's regions. ..."   The
team would be compensated in part by equity in the real estate
projects developed, as well as payment on an hourly basis for
services rendered.

67.  A true and accurate copy of the April 19, 1996
memorandum from Hay to CPI is attached as Exhibit D.

68.  Hay also proposed that he and CPI work together with
Hebert to found a Russian real estate mutual fund.  He wrote in
his April 19, 1996 memorandum:

23

Real Estate Mutual Fund.  The Real Estate Services Group
should also form together with CPI a domestic mutual
fund to invest in real estate.  This project would
combine expertise of CPI, [Hay's] Real Estate Services
Group, and piggyback on the mutual fund infrastructure
being created in the project with Elizabeth Hebert.

69.  Subsequently, Hay and CPI had further discussions
concerning a proposed real estate venture and, in May 1996, CPI
confirmed its understanding that it would form a real estate
services company to be owned 50% by CPI and 50% by "Hay & Key
Russian Partners (50%)."  One of the goals of this company was to
"[f]ind and package properties that CPI can purchase and lease,"
including to a public program to which Hay was an advisor.  The
proposal specifically noted that "the lower the costs to buy and
the higher the rent, the earlier and higher will be [their]
profits."

70.  Thus, Hay was negotiating a deal by which he would
profit personally by charging higher rent to a public program
while he was serving as an advisor to and about the program.

71.  In furtherance of this plan, Hay and other publicly
funded staff under his direction attended a meeting on behalf of
this real estate company, which was named Korona.  At that
meeting, Hay and other publicly funded staff handed out Korona
business cards with their names printed on them and solicited
business for Korona.  Hay also arranged for Korona to receive
contracts for managing the offices of the publicly funded advisory
organization he was overseeing.

72.  Hay was also involved in providing advice to the Russian
Securities Commission concerning the creation of a regulatory
scheme to permit mutual funds to invest in real estate, while at
the same time he was planning to participate in the creation of
such a mutual fund himself.   Hay took USAID funded staff to
Siberia to view potential properties and charged their time and
travel expenses to USAID.  Hay also used his USAID funded position
to assign World Bank funded staff to work for Hebert in launching
the proposed real estate mutual fund, and he permitted Hebert to
use USAID funded and/or World Bank funded office space for these
purposes.

> (v)  Hay's and Zimmerman's Scheme for Hay, His Father
> and FFIA to Trade Russian Government Bonds (GKO's)
> Without Paying Repatriation Tax

73.  Hay assisted Shleifer's wife Zimmerman and others at
FFIA beginning in late 1995 or early 1996 in creating a scheme to
trade in short-term Russian government bonds ("GKO's"), and to
repatriate the profits to the United States beyond the limits
otherwise permitted by the Russian currency exchange rules.   At
the time, profits from GKO sales in Russia by foreigners were
subject to a substantial tax to prevent foreigners from taking the
high returns available on these bonds out of the country.

74.  Hay and Zimmerman devised a scheme to repatriate the
profits from the GKO trades by disguising the profits as "loan
payments" so as to avoid the Russian repatriation tax.   FFIA set