up a Russian company, Novy Mir or New World Capital, which took out a "loan" of $5,000,000 from Central Illinois Bank and used the funds to invest in GKO's.  This "loan" was 100% secured by a certificate of deposit purchased by the Farallon entities at the Central Illinois Bank and guaranteed by the Farallon entities. The profits on the GKO trades were sent to the Central Illinois Bank as loan repayments and then paid to the Farallon entities. These transactions were entered into by Central Illinois Bank at the request of Nancy Zimmerman's father, a shareholder and member of the Board of Directors of the Central Illinois Bank's holding company.

75.  The General Director of Novy Mir was a full-time employee of Harvard's Russian affiliate, ILBE, paid with USAID Cooperative Agreement funds.   This General Director, Hay, and at least one other USAID funded staff person all assisted in the scheme.

76.  Hay and his father invested in and profited from these GKO sales.  On or about June 17, 1996, Hay's father purchased $150,000 worth of GKO's from Zimmerman's company using $50,000 of Jonathan Hay's funds.  On or about August 30, 1996, Hay's father sold the GKO's and Zimmerman's company paid him by wire $160,800. On or about September 10, 1996, Hay's father transferred to Jonathan Hay $53,359, including $3,359 in profit on this six week investment.

77.   As an advisor to the Russian Deputy Prime Minister for Economic Affairs on stabilization policy (including government debt policy) and as a participant in negotiations concerning financing of the Russian government debt, Shleifer had valuable confidential information concerning the Russian bond market. Accordingly, he was in a position where he would have been likely to have had advance notice if the government were suddenly going to stop backing its debt.   This allowed Shleifer, Zimmerman, Hay and Hay's father to avoid the significant potential risk in this market which (along with the exclusion of foreigners) resulted in the high returns from which they all profited.

78.   Shleifer's own writings explain the significant economic value of such information.   In a 1997 article written with Daniel Triesman, Shleifer stated:

> For most of 1994-96, rates of return on GKOs were far above the inflation rate, rising at one point to more than 150 per cent a year in real terms. ...   But since the risk could be fully or partly eliminated by advance information of changes in government policy, this information in effect served as a barrier to protect rents in the market for those dealers sufficiently close to the financial authorities to be sure they would be informed.

79.   By virtue of their positions as advisors to Russian officials, and their participation in the crafting of Russian stabilization and debt policy, Shleifer and Hay were sufficiently close to Russian financial authorities to expect that they would be informed of changes in government debt policy.

D.    Other Harvard Staff Members Were Aware of Problems on
      the Harvard Project, Including the Misuse of Funds and
      Preferential Treatment to Pallada and FRSD, But Harvard
      Failed to Act.

80.    Harvard also mismanaged and failed to supervise properly

the Project, and failed to safeguard the USAID funds entrusted to

Harvard.  Harvard was paid by USAID specifically to provide this

type of administrative oversight, but failed in its obligation to

do so properly.  Instead, Harvard administrators were aware of

abuses and allowed them to continue.  For example, the HIID

Assistant Director for Contract Administration was aware of and

repeatedly objected to the high salaries and perks given to

certain project staff members with USAID funds.  She complained

that some of the payments were "double-dipping" and wrote to

Shleifer, "I can't imagine that you will do anything about this,

but I believe that it is not right all around and does not show

good faith on anyone's part."   On another occasion, this Contract

Administrator also warned that she would "rue the day" for Harvard

and HIID that these "salaries and add-ons" became known to USAID.

Among the persons whose salaries and benefits she objected to were

those involved in assisting Hay, Shleifer, Zimmerman, Hebert and

Zagachin with their various private businesses and investments.

81.    Harvard financial administrators and/or staff were also

aware that numerous employees on the USAID funded payroll at

Harvard's subcontractor, ILBE, were hired for improper reasons,

unqualified and/or did not show up for work on a regular basis,

28

other than to collect their pay or for the free lunches.
Nonetheless, Harvard continued to bill these staff to USAID.

82.  Harvard staff members also were aware that in the summer
and/or fall of 1996, Zagachin and Hebert were permitted to use
USAID funded office space, phones, mailbox and faxes and
facilities for their private businesses, i.e., the establishment
of Pallada and the FRSD.

83.  Harvard staff members also knew that in September 1996,
Hebert and Zagachin moved together into space funded by World Bank
loans and that this raised at least the appearance of favoritism.
For at least several months, the FRSD and Pallada were apparently
the only mutual fund and depository permitted to use World Bank
funded space at the first Collective Investment Center, space
intended to provide information about mutual funds generally.  At
some point in the fall of 1996, Harvard staff members also learned
that Pallada was owned 1.96 percent by an entity affiliated with
ILBE known as ILBE Consulting.

84.  In the fall of 1996 and the spring of 1997, several
Harvard staff members and/or consultants sought out Hay and/or
Shleifer and raised with them the potential conflict and
appearance of conflict arising from Hay's relationship with
Hebert, and the favorable treatment that Pallada was receiving
from Hay.  Although Hay purported to recuse himself from all
matters dealing directly with Pallada, to the knowledge of Harvard

staff members, he did not do so.  In fact, during the same time period, Shleifer approved Hay's assuming a position of greater responsibility with respect to the capital markets and mutual fund regulations work, and sought to fire at least one of the persons who had raised the conflict issue.

85.  Competitors of Pallada also raised with Harvard personnel the issue of unfavorable treatment toward them and their concerns that there was not a level playing field in the emerging Russian mutual fund market due to Hay's association with Hebert. Harvard's actions, instead of fulfilling their intended purpose of fostering trust and openness in the nascent mutual fund market, in fact involved exactly the type of favoritism and perceived and actual barriers to entry and success that the United States was spending hundreds of millions of dollars to dispel.

86.  Key Harvard employees were marginalized and/or removed after they objected to, or refused to participate in, the misuse and/or diversion of USAID and other public funds.  Numerous Harvard employees were aware of the fact that USAID funded resources were being misused for the benefit of Hebert and Zagachin and otherwise.  Nonetheless, corrective action was not taken by Harvard to address and rectify these issues.

30

## VI. LEGAL CLAIMS

### COUNT I

(False Claims Act - False Claims - All Defendants)

87.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1), for Defendants knowingly presenting, or causing to be presented, false and/or fraudulent claims for payment or approval to the United States.

88.   The United States repeats and realleges each allegation set forth above in paragraphs 1 through 86.

89.   By virtue of the acts described above and others, Defendants knowingly submitted and/or caused to be submitted false and/or fraudulent claims in the form of Harvard's and other USAID contractors' invoices and/or cash reports to USAID.   True and accurate copies of Harvard's cash reports or invoices to USAID are attached as Exhibit E.   Harvard's cash reports such as those attached as Exhibit E falsely stated that all disbursements listed therein were made "for the purpose and conditions" of the Cooperative Agreements.   These statements were false because the services provided were not in conformance with the purposes and conditions of the Cooperative Agreements, including specifically the prohibitions on investments in Russia.

90.   These statements were also false and/or fraudulent because they included specific impermissible charges which were not for the purposes or conditions of the Cooperative Agreements,

31

including, but not limited to, the compensation of at least one
USAID staff person to do research on the price of oil stocks and
at least five USAID funded persons to work on a private aluminum
company merger involving an aluminum company in which Shleifer and
Zimmerman held stock; Zagachin's full-time salary, as well as her
travel, at the time she was working on launching a private
business with Elizabeth Hebert; the payment of time and travel
costs for a trip to investigate proposed real estate investments
by CPI and/or Hay; the costs of USAID funded office space and
equipment; and payment for the time of Hay and other USAID funded
staff and consultants who assisted Hebert, Zagachin and Zimmerman
in their various business operations in Russia.

91.    These statements were also false and/or fraudulent
because Harvard, Hay and Shleifer had contractual and/or fiduciary
duties to the United States which required its Project Director,
Shleifer, and its General Director, Hay, to refrain from investing
in Russia and to disclose any financial interests in Russia.   By
failing to disclose their personal and financial interests in the
matters which were within the scope of their duties on behalf of
USAID, Shleifer, Hay, and Harvard made false or fraudulent
misrepresentations to USAID.

92.    Had Harvard disclosed these advisors' personal financial
involvements in Russia, USAID would have insisted upon their
removal from the Project and refused to fund all subsequent

32

amendments and contracts led by them, as it ultimately did in the spring of 1997 when it learned of some of these advisors' financial interests in Russia.

93. The United States paid Harvard's and other contractors' invoices based on Defendants' false and/or fraudulent statements, including misrepresentations and material omissions.

94. By reason of these payments, the diversion of USAID funded resources to improper purposes, and the harm to the United States' program in Russia due to Defendants' conduct, the United States has been damaged.

<u>COUNT II</u>

(False Claims Act - False Statements - All Defendants)

95. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(2), as amended, for Defendants knowingly making and/or causing to be made or used, false and/or fraudulent statements or records to get false and/or fraudulent claims paid or approved by the United States.

96. The United States repeats and realleges each allegation set forth above in paragraphs 1 through 94.

97. Defendants made and/or caused to be made false and/or fraudulent statements to USAID by failing to disclose to USAID material facts concerning their lack of financial disinterestedness in the matters under their supervision, which Harvard, Shleifer and Hay had contractual and/or fiduciary duties

33

to disclose.

98.   By virtue of the acts described above and others, Defendants knowingly made or caused to be made false and/or fraudulent statements or records to get false and/or fraudulent claims paid or approved by the United States.   These false and/or fraudulent statements included the failure to disclose material facts, specific false certifications such as those attached as Exhibit E, as well as the false 1995 Conflict of Interest Statement submitted by Harvard to USAID.   As a result of these false and/or fraudulent statements and misrepresentations, USAID continued to pay Harvard and other contractors under Harvard's supervision.   By reason of these payments, the diversion of USAID funded resources to improper purposes, and the harm to the United States' program in Russia due to Defendants' conduct, the United States has been damaged.

## COUNT III

(False Claims Act - Conspiracy - All Defendants)

99.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(3), against Defendants for conspiring with others to defraud the United States by getting false and/or fraudulent claims paid or allowed by the United States.

100. The United States repeats and realleges each allegation set forth above in paragraphs 1 through 98.

34

101. Defendants agreed to engage in the conduct described above, including the use of the resources and services funded by USAID for the personal and/or business benefit of the Defendants instead of for the purposes provided for by the Cooperative Agreements, and engaging in private businesses in violation of Harvard's, Shleifer's, and Hay's duties to the United States.

102. By virtue of the acts described above and others, Defendants knowingly conspired to defraud the United States by getting false and/or fraudulent claims paid by the United States, including the invoices attached as Exhibit E.

103. The United States paid these claims because of Defendants' fraudulent misrepresentations and omissions.

104. By reason of these payments, the diversion of USAID funded resources to improper purposes, and the harm to the United States' program in Russia due to Defendants' conduct, the United States has been damaged.

COUNT IV

(Common Law Fraud - Harvard, Shleifer, Hay)

105. The United States repeats and realleges each allegation set forth above in paragraphs 1 through 104.

106. Defendants made and/or caused to be made fraudulent representations to the United States, including the invoices attached as Exhibit E.

107. Defendants made and/or caused fraudulent material

35

representations to the United States, including the failure to disclose facts when they had a duty to so disclose, with actual knowledge of their fraudulent nature and/or with reckless disregard for their truth.

108. Defendants intended that the United States rely upon these material misrepresentations.

109. The United States did, in fact, reasonably rely upon Defendants' fraudulent representations, as a result of which USAID funded resources were diverted to improper purposes and the United States has sustained damages.

### COUNT V

(Breach of Fiduciary Duty - Harvard, Shleifer and Hay)

110. The United States repeats and realleges each allegation set forth above in paragraphs 1 through 109.

111. Harvard, Shleifer and Hay owed fiduciary duties to USAID based upon at least: (1) the terms of the Cooperative Agreements, their positions in connection with those Cooperative Agreements, and Harvard's representations to USAID that its advisors would provide impartial, unbiased advice without any financial interests therein; and (2) the reliance of USAID on Harvard's, Shleifer's and Hay's expertise and superior knowledge in the areas in which they were providing advice and oversight pursuant to the Cooperative Agreements.

112. Harvard, Shleifer and Hay had undisclosed conflicts of

36

interest and failed to act in the best interests of the United
States in the exercise of these fiduciary duties.

113. By virtue of the provisions of the Cooperative
Agreements, and the trust and responsibility reposed in Harvard by
the United States, Harvard, Shleifer and Hay were responsible for
the faithful accounting and safekeeping of Project assets and the
proper fulfillment of the Project's purposes in compliance with
USAID's terms and conditions.

114.   Unknown to the United States and without its consent,
Harvard, Shleifer and Hay breached their fiduciary duties,
diverted USAID funded resources to improper purposes and abused
the trust and responsibility placed in them.

115.   As a result of Harvard's, Shleifer's and Hay's breaches
of their fiduciary duties, and the diversion of USAID funded
resources to improper purposes, the United States has been harmed.

<u>COUNT VI</u>

(Breach of Contract -Harvard)

116. The United States repeats and realleges each allegation
set forth above in paragraphs 1 through 115.

117. By reason of the actions described above, Harvard
breached its Cooperative Agreements with the United States by not
providing the services for which Harvard billed and by billing in
violation of the Cooperative Agreements' terms and conditions,
including specifically the term requiring that employees of the

37

grantee not engage in any business, investment or loan in the
country to which the individual is assigned.

118. By reason of the breach of contract described herein,
and the resulting diversion of USAID funded resources to improper
purposes, the United States has been damaged.

COUNT VII

(Payment by Mistake - Harvard)

119. The United States repeats and realleges each allegation
set forth above in paragraphs 1 through 118.

120. Defendants caused the United States to make payments
based upon the United States' mistaken belief that all the
Cooperative Agreements' requirements and specifications for work
performed had been met and that amounts billed were for work
performed for the purposes of the Project.  In such a
circumstance, payment by the United States to Harvard was by
mistake and was not authorized.

121. As a result of that mistaken payment, and the resulting
diversion of USAID funded resources to improper purposes, the
United States has sustained damages.

COUNT VIII

(Fraudulent Inducement - Harvard, Shleifer and Hay)

122. The United States repeats and realleges each allegation
set forth above in paragraphs 1 through 121.

123. Harvard, Shleifer, and Hay caused the United States to

38

enter into amendments to the first Cooperative Agreement and to enter into the second Cooperative Agreement based upon the fraudulent representation that the Cooperative Agreements' requirements and specifications for work performed were being met, and that amounts billed were for work performed for the purposes of the Project.  In such a circumstance, the Agreements and amendments thereto were induced by fraud and are void and/or voidable.

124. As a result of this fraudulent inducement, USAID funded resources were diverted to improper purposes, and the United States has sustained damages and is entitled to the return of all funds paid pursuant to fraudulently induced amendments to the first Cooperative Agreement and pursuant to the second Cooperative Agreement.

COUNT IX

(Unjust Enrichment and Disgorgement - All Defendants)

125. This is a claim for recovery of monies which Defendants have diverted, received improperly, and/or by which Defendants have been unjustly enriched.

126. The United States repeats and realleges each allegation set forth above in paragraphs 1 through 124.

127. The United States paid to Harvard amounts in excess of that to which it was entitled, and/or for services and/or property which were not properly billable under the terms of the

39

Cooperative Agreements, based on Defendants' false and fraudulent statements, misrepresentations and omissions, and breaches of fiduciary duties, by which Defendants have been unjustly enriched. In addition, Defendants obtained assets, businesses and profits from their improper and illegal use of USAID and other public resources by which they have been unjustly enriched.

128. The United States is entitled to the return of monies diverted and paid improperly, and the disgorgement of any profits or items of value obtained by Defendants in connection therewith, along with interest from the time obtained.

<u>COUNT X</u>

(Aiding and Abetting)

(Shleifer, Hay, Zimmerman, Hebert)

129.   The United States repeats and realleges each allegation set forth above in paragraphs 1 through 128.

130. Defendants aided and abetted in the wrongdoing described above, including the diversion of USAID resources to improper purposes and breach of fiduciary duties, which duties Defendants knew Harvard, Shleifer and Hay owed to the United States, by assisting them in using their USAID funded positions, resources and influence for the private benefit of the Defendants.

131. Defendants Hebert, Zimmerman and Shleifer aided and abetted Hay in diverting USAID funded resources and breaching his and Harvard's fiduciary duties to the United States by investing

40

his own money in various private business ventures and well as in directing USAID resources under his direction to their private benefit.  These resources included the time of USAID and World Bank funded staff and office space.

132. Defendants Zimmerman and Hay also aided and abetted Shleifer in diverting USAID funded resources and in breaching his and Harvard's fiduciary duties by investing in various Russian equities and concealing those investments from USAID, while working under Cooperative Agreements which did not permit such conflicts and pursuant to which Shleifer provided advice related to and potentially affecting the entities in which he had invested.

133. Defendant Shleifer also aided and abetted Hay in breaching his and Harvard's fiduciary duty to the United States by investing Hay's funds in Russia oil stocks at a time when Hay was employed under a USAID funded Cooperative Agreement which prohibited such investments and required Shleifer to report any such violations to USAID.

134. Defendants benefitted from their participation in Shleifer's, Hay's and Harvard's misconduct by receiving preferential treatment, inside information and profits for their and/or their family members' businesses.

135. As a result of this conduct, and the diversion of USAID funded resources, the United States was harmed, including by

41

paying Harvard, and through Harvard, Shleifer and Hay, funds to
which they were not entitled.

## COUNT XI

### (Civil Conspiracy - All Defendants)

136. The United States repeats and realleges each allegation
set forth in paragraphs 1 through 135 above.

137. By reason of the actions described above, Defendants did
combine and agree to commit unlawful acts, including the diversion
of USAID funded resources and the breach of fiduciary duties
described above, by which the United States has been harmed.

138. As set forth above, Defendants took specific actions in
furtherance of that conspiracy, including the use of USAID funded
resources and the transfer of funds to create financial interests
for Shleifer and Hay and their family members and associates in
matters which were within the scope of duties of Shleifer, Hay and
Harvard, and in breach of the fiduciary duties owed by Harvard,
Shleifer and Hay to the United States.

### PRAYER FOR RELIEF

WHEREFORE, the United States demands judgment against the
Defendants as follows:

A.   On Counts One through Three, judgment against Defendants
named therein, jointly and severally, for triple the damages
sustained by the United States, plus civil penalties as are
allowable by law in the amount of $5,000 to $10,000 per claim,

42

costs, and all other proper relief;

B.   On Counts Four through Eleven, judgment against the
Defendants named therein, jointly and severally, for the damages
sustained, all profits earned by virtue of their wrongdoing,
punitive damages where permitted by law in an amount sufficient to
punish and deter, pre-judgment interest, costs, an accounting of
all funds paid and/or received by the Project, and all other
proper relief;

C.   On Count Five and Counts Seven through Eleven, an
accounting of, and a constructive trust over, all funds improperly
paid and all profits and items of value improperly obtained by
Defendants;

D.   And such further relief, on all Counts, as the Court may
deem appropriate.

THE UNITED STATES DEMANDS A JURY TRIAL AS TO ALL ISSUES SO
TRIABLE.

UNITED STATES OF AMERICA

By its attorneys,

DONALD K. STERN
United States Attorney

By:

_____
SARA M. BLOOM
Assistant U.S. Attorney
Suite 9200, One Courthouse Way
Boston, MA   02210
(617) 748-3265

43

MICHAEL F. HERTZ
JUDITH RABINOWITZ

By:

ALICIA J. BENTLEY
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
202-616-9854

September 26, 2000

44

From: Andrei Shleifer
To: David Cohen, Igor Tsukanov
Re: our agreement

1. Farallon will buy shares in Russian oil and other companies on the advice of Igor. Igor will provide Farallon with information on what is available in Moscow and elsewhere in Russia and at what prices. The shares will be owned by Farallon.

2. The initial investment is anticipated to be $2 million, with increase to $5 million if sufficient investment opportunities are available. Shleifer will invest 10 percent as his own capital, with shares to be owned by Nancy Zimmerman.

3. The portfolio will be evaluated after 1 year (i.e, on August 1, 1995), at which point Igor will be compensated. Igor has the right to force the sale of the portfolio or be compensated earlier based on the return as soon as the portfolio rises in value by more than 100 percent. Igor also has the right to be consulted before any sale of shares, and has the right of first refusal on any shares sold against his recommendation.

4. Igor will provide basic information on a group of companies that Farallon will invest in.

5. Farallon will maintain a track record for Igor.

6. Igor (or CentreInvest) will be compensated as follows:

As of the time of settling up (which is 1 year or before), the full return up to annualized rate of 25 percent goes to Farallon (hurdle). After the hurdle, we are looking at total returns, rather than annualized returns. Of the incremental return up to 50 percent total return, Igor gets 15% of the return, between 50 and 75, Igor gets 20% of the return, between 75 and 100, Igor gets 25% of the return, between 100 and 150, Igor gets 30% of the return, and above 150, Igor gets 35% of the return. Andrei gets 10% of the return above the hurdle.

7. Farallon ~~has to agree to~~ controls every purchase and sale of shares. Farallon will either sign documents for purchase and sale of shares and transmit them by FAX or give the right of the attorney to a designated person. Farallon will pay a designated international account as soon as it gets a transfer receipt and a tax document. Alternatively, Igor can buy shares and sell them at the same price to Farallon. (including)

8. Igor will not do any other Russian oil company investing (~~except~~ including personal purchases) until Farallon is fully invested.

CONFIDENTIAL                    F    00175

From: Andrei Shleifer
To: David Cohen, Igor Tsukanov
Re: our agreement
Date: July 28, 1994

1. Farallon will buy shares in Russian oil and other companies on the advice of Igor. Igor will provide Farallon with information on what is available in Moscow and elsewhere in Russia and at what prices. The shares will be owned by Farallon.

2. The initial investment is anticipated to be $2 million, with increase to $5 million if sufficient investment opportunities are available. Andrei will invest 10 percent as his own capital, with shares to be registered to Nancy Zimmerman.

3. The portfolio will be evaluated after 1 year (i.e. on August 1, 1995), at which point Igor will be compensated. Igor has the right to force the sale of the portfolio or be compensated earlier based on the return as soon as the portfolio rises in value by more than 100 percent. Igor also has the right to be consulted before any sale of shares, and has the right of first refusal on any shares sold against his recommendation.

4. Igor will provide basic information on a group of companies that Farallon will invest in.

5. Farallon will maintain a track record for Igor.

6. Igor (or CentreInvest) will be compensated as follows:

As of the time of settling up (which is 1 year or before), the full return up to annualized rate of 25 percent goes to Farallon (hurdle). After the hurdle, we are looking at total returns, rather than annualized returns. Of Farallon's incremental return up to 50 percent total return, Igor gets 15% of the return, between 50 and 75, Igor gets 20% of the return, between 75 and 100, Igor gets 25% of the return, between 100 and 150, Igor gets 30% of the return, and above 150, Igor gets 35% of the return. Andrei gets 10% of the return above the hurdle.

7. Farallon has to agree to every purchase and sale of shares. Farallon will either sign documents for purchase and sale of shares and transmit them by FAX or give the right of the attorney to a designated person. Farallon will pay a designated international account as soon as it gets a transfer receipt and a tax document. Alternatively, Igor can buy shares and sell them at the same price to Farallon.

8. Igor will not do any other Russian oil company investing (except personal purchases) until Farallon is fully invested. However, if Farallon refuses to buy a block of shares offered to Igor, Igor can sell it to other parties at a price that is not lower. Farallon will not buy shares in Russian companies except through Igor (the exception is that Farallon can buy a small amount of shares though brokers such as CSFB or Salomon to get access to their information bases).

9. Farallon will provide an official letter of agreement confirming these points by Monday, Aug. 1.

*Send during agreement shortly*

(8)

TOTAL P.02

CONFIDENTIAL

00176

GICOS

May 16, 1996
To: Tom Steyer
Re:  Specialized Depository

1.0   Introduction. As you know, we are seeking USD 1.2 million to create a fund management company and a fund administrator/custodian ("Specialized Depository") in Russia.  I understand from Nancy that you wish to have some more information on the specialized depository.   This note explains a) the function of a specialized depository, b) why the Specialized Depository that we create is likely to be successful, c) our assumptions about profitability, d) our competition, and e) the link with the proposed Fund Management Company.

2.0   Function of Specialized Depository.  Under recently issued mutual fund regulations (which were drafted by the Russian legal team that I manage), fund management companies must sign a contract with an independent Specialized Depository.  Under the regulations, the Specialized Depository provides custodial services and is responsible for the compliance of fund management companies with certain parts of the regulations (e.g. restrictions on the investment portfolio).  In practice, the Specialized Depository will also be responsible for a) maintaining a registry of unit holders (including issuing and cancelling units), b) the accounting for fund assets and transactions, and c) pricing of assets (on a daily basis in the case of open mutual funds).  The Annex to this note describes in more detail the function of the Specialized Depository.

3.0   Why we expect our Specialized Depository to succeed?  The reasons have to do with a) regulation, b) management, c) first mover advantage, d) assured client base, e) presence of a strategic partner and e) the availability of subsidy. These reasons are discussed below.

3.1   Regulation.   Both investment fund managers and specialized depositories must be licensed.  The regulatory requirements for getting a fund management license are relatively light.   The regulation of fund managers is mostly delegated to the market, to the choices of investors.   The Federal Commission for Securities and the Capital Market (e.g. the Russian SEC) recognizes that it should not be in the business of choosing fund managers for investors.  On the other hand, the regulatory requirements for specialized depositories are severe.  Before issuing any licenses to potential specialized depositories, the Federal Commission will ensure the integrity of systems for processing flows of units and finance between investors and the fund, b) the proper maintenance of the registrar of investors, c) the adequacy of accounting for assets, and d) the safekeeping of assets.  Regulations provide many mandatory procedural and processing requirements for specialized depositories.  The requirements will be made more detailed on the basis of the Federal Commission's experience with our Specialized Depository.  Specialized Depositories will be audited

CONFIDENTIAL                     F  01166

frequently by the Federal Commission. The Federal Commission expects to issue few licenses to specialized depositories which means that a) the market for these services will be divided between few organizations (in the short to medium term we expect to capture most of the market) and b) pricing is likely to be less than perfectly competitive.

Our project stands to benefit more than any other from the Federal Commission's approach to regulation. This is for three reasons. First, we have the best probability of receiving a license. Our project is the flagship Specialized Depository of the Federal Commission designed to set the standard for the market place and to be used to define the operational and procedural thresholds that must be met by others to enter the business. Every decision we make about design, systems and procedures will be taken in close cooperation with the Federal Commission. Our project will be established with the active involvement of the Russian legal team that the Federal Commission entrusted with the drafting of the original mutual fund regulations. Second, we are likely to get a license before anyone else which will give a significant first mover advantage (discussed below). Third, our project will set the market standard. Given this project's relationship to the Federal Commission, any other attempts by definition will be in a catch up mode.

3.2    Management. We have the best management team. The ability of management is proven in Russia and has an exceptional reputation for honesty and competence which is unique in the Russian market place. The president, Julia Zagachin, is one of a few professionals who have successfully built large infrastructure operations, earned the confidence of the Federal Commission, every major western institutional investor active in the Russian equity markets, the Russian brokerage and banking community.   She is completely bi-lingual and bi-cultural.  The future head of operations, Nadezhda Masenkova is currently Chief Operating Officer of the DCC. She developed procedures and controls currently in use by the DCC. The strategic partner (discussed below) brings a first rate management team with similar western expertise that will be involved in the set up of the Specialised Depository.

3.3    First mover advantage. The economics of the Specialised Depository business give the advantage to the first group that gets established and attracts clients.   In Russia, we are that group. In the early phase while no one else is set up we can be profitable with lower volumes of  processing and high margins.   As the business progresses, we can lower margins and maintain profitability with higher volumes of processing. Any other competitor that wishes to beat our prices must be able to immediately get the higher volumes that make it possible to live with the lower margins. The need for high volumes for profitability should be a significant barrier to entry for new competitors.  This is also the case in the West where this business tends to be concentrated with a very few providers such as State Street/DST in the United States or Hexagon and Premier Trust in the United Kingdom.  In the short to

2

medium term our advantage comes from the fact that the regulator wants us to be first. In the future we can keep our dominant position through a quality service at low prices where profitability is maintained by the fact that we built up higher volumes in the early years.

3.4    Assured client base.  We have an assured client base for two reasons.  First, we are establishing the Specialised Depository simultaneously with the establishment of a fund management company.  The fund management company will be managed by Elizabeth Hebert who has managed the best performing fund publically traded Russia fund for the last two years.  Her commitment to use the Specialised Depository will be an important signal to other potential clients.  When Elizabeth chose to use the DCC as her custodian in Russia (at that time managed by Julia Zagachin), other market participants followed. We expect that the similar pattern will occur with the Specialised Depository.    Second, the Federal Commission will direct potential fund managers to use the Specialised Depository that we are establishing.  This is natural since the Federal Commission has an interest in ensuring that its flagship project sets the standard for the market place, and it has an interest in ensuring that fund managers that are licensed use the Specialised Depository that best meets regulatory standards.

3.5    Presence of strategic partner.  Forum Financial is the strategic partner.  The company is a Portland, Maine based fund administrator/distributor for commercial banks managing funds in the US but restricted by banking regulations from distributing funds directly to the public.  Forum currently provides fund administration, transfer agency and valuation services to clients with $14 billion under management.  They also have a start-up operation in Poland. Forum won a tender conducted by the World Bank and the Russian Commission to establish the procedures and design the systems to be used by the model depository.  Forum will contribute technical know-how of operations and systems.  They will also contribute senior management expertise and systems specialists to shadow the local management team.  The presence of a strategic partner should ensure that we are protected from making mistakes in the selection of systems and the development of procedures.

3.6    Subsidy from World Bank Funds.  The Federal Commission has awarded Forum Financial $2.5 million to develop systems and procedures for a model Specialised Depository. The Federal Commission has indicated that the Specialized Depository that we propose to create will be the Russian beneficiary of this work.  This money will be used to pay consultancy fees, rent, translation of software, systems development, write procedures, and advise the Commission on regulatory issues.  We also expect that the proposed Specialized Depository will be hired by Forum Financial as a sub-contractor, and that, as a result, the company will immediately generate revenue with should fund some of the start up costs. As a result the investment is significantly reduced, as operations of this type tend to require a high up front investment.

3

CONFIDENTIAL

4.0    Assumptions About Profitability.   The key variables that determine profitability of the Specialized Depository are a) the fixed cost of establishing the Specialized Depository, b) the marginal  cost of processing a client account, c) the price that can be charged for processing a client account, and d) the number of client accounts that the Specialized Depository will process.  The assumptions that we have made are illustrated in the table entitled "Administration Bureau."

While we believe that we have all the pieces in place to make the Specialized Depository successful, we never established such a business and do have some uncertainty about the precision of the numbers reflected in the business plan.  For example, while we have the advantage that many of the fixed costs will be covered by the technical assistance funds, we are uncertain about the fixed costs associated with the establishment of a custodial service.  Like many other issues, the issue of whether or not it is necessary to establish a custodial service (or whether for some assets we can or should use services provided by others) is one that will have to be addressed with our strategic partner in the implementation of this project.

Due to such uncertainties, we have used very conservative figures in the business plan.  The business plan shows that the Specialized Depository will charge between $15 and $12 per year per client account per year (i.e between 1% and 1.5% on an average investment of $ 1000).  We have been told that a comparative figure in the United States or the United Kingdom is $30. The low price reflects i) our lack of knowledge about the number of transactions per account per year, and ii)  sensible caution about the ability to charge monopoly prices. Even if we are the dominant player in the market, we think it is possible that there would be pressure from regulators to keep prices down. Our foreign ownership and management structure also makes us reluctant to assume that we can "charge through the nose" for our services.  Our assumptions about price and cost are illustrated below:

| Year of operation | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Price charged for processing a single client account | $12 | $12 | $12 | $12 | $12 |

4