UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA,
                    Plaintiff,
     v.

THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, ANDREI SHLEIFER,
JONATHAN HAY, NANCY ZIMMERMAN,
AND ELIZABETH HEBERT,
                    Defendants.

Civil Action No. 00-CV-11977-DPW

---

## UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO LIMIT THE LENGTH AND SCOPE OF DAMAGES DISCOVERY

Defendants purport to seek to limit discovery on damages but in fact do not do so. Instead, they seek to discover and offer in their own defense all of the evidence that they propose to deny the United States, which is the very evidence they have consistently claimed is what is required to prove damages in this case. They offer no valid basis for their newly minted proposed one-sided limitation. Moreover, they do not actually set forth a schedule for the purportedly limited discovery they propose. They offer no explanation of what depositions or document discovery their proposal would eliminate, nor have they ever provided either the United States or the Court with a list of the witnesses they would call. Their proposal is unsupported by law, ill-defined, and unworkable, and should be rejected.

What the United States expects to prove as its expectation and/or FCA measure of damages is the difference between the value of the services as received and retained and the value of the services as promised. The Defendants' failure to fulfill the precise and articulated goals of these two Cooperative Agreements is exactly the sort of damages evidence a jury can and should consider and that Defendants have long argued that the United States must offer to

prove its damages case.

Defendants seek to create the impression that they are proposing to limit discovery by claiming that the United States is seeking to recover damages for a "lost" Russia.  To the contrary, the United States is seeking to recover damages for the loss of the honest services of Harvard and its employees that the United States contracted and paid for, but did not receive. The United States is entitled to damages for the diminished value of Harvard's services due to the conflicts and self-dealing.  Here, Defendants' conflicts and self-dealing in the very areas in which they were providing advice not only did not fulfill, but in fact undermined, the articulated goals of the Cooperative Agreements.

Defendants' proposal that the United States be barred from even seeking discovery on the issue of whether the work of the Project, in fact, failed to support "transparency, good corporate governance and a functioning rule of law" in Russia makes no sense.  These were the goals and objectives of the two Cooperative Agreements and thus are proper subjects for discovery and proof at trial, along with the many ways in which the Defendants, because of their private investments, abused, wasted, misdirected, and corrupted the Project.

To the extent that Defendants are now suggesting that the full extent to which their conduct failed to accomplish the goals of the Project cannot be established, that uncertainty must ultimately be borne by them.   "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265 (1946).  In the meantime, however, the United States is entitled to the discovery it seeks to see what it can prove at trial, and Defendants' motion should be denied.

2

## I.     THE UNITED STATES' EVIDENCE MAY NOT BE EXCLUDED ON THE BASIS THAT IT GOES TO "CONSEQUENTIAL" OR "SPECIAL DAMAGES"

There is no merit to Defendants' argument, namely that the Court should exclude much of the damages evidence the United States proposes to develop in discovery and offer at trial on the basis that it goes to "consequential," or "special," damages that the United States may not assert. See Defs.' Mot. to Limit Damages Discovery at 8-11 (seeking to exclude damages set forth at U.S. Prelim. Description of Expected Damages Evidence at 22-29).  Defendants seek to preclude the United States from taking discovery of and showing that: (1) the prohibited conflicts and self-dealing corrupted the work of the Project in four key areas and resulted in the failure to complete key elements of the Project; (2) the prohibited conflicts and self-dealing undermined the goals for the Harvard Project that were expressly articulated in the Cooperative Agreements; and (3) the prohibited conflicts here resulted in the misdirection, undermining and waste of work done by non-Harvard USAID funded participants in the broader United States-funded effort of which the Harvard Project was only a part.

Defendants' arguments lack merit, first and foremost, because their proposal would not actually eliminate any discovery, since these categories of evidence all go to matters Defendants seek to retain the right to establish in connection with their defense and their offset claim.  They also are appropriate matters for discovery and proof at trial since they go directly to the United States' breach of contract and FCA damages.

### A.     The Evidence Defendants Want Excluded Goes To Their Defense and Their Offset Claim So Their Proposal Eliminates No Discovery

Defendants' proposed exclusion of this evidence would do nothing to limit discovery, since they propose to preclude the United States from discovering and offering evidence while

still claiming a right to discovery on all the same issues.

Defendants are now changing their position on damages and seeking to exclude all evidence of the value of the work they performed – the very evidence they argued in January 2003 the United States needed to offer, on an issue they then insisted was sufficiently clear to be provable at trial.[1]   In a footnote, Defendants continue to argue that under the FCA, the market value of the goods or services received is an "offset" built into the statutory damages calculation. Defs.' Mot. to Limit Damages Discovery at 5, n. 1.  By Defendants' own statement of the law, the United States must prove "the difference between the market value of the [goods/services the government] received and retained and the market value that the [goods/services] would have had if they had been of the specified quality."  Id.  The United States expects to demonstrate that because of the conflicts, self-dealing and corruption here, the services the United States received and retained were bad advice and a waste of resources that undermined, rather than furthered, the specified goals of the Cooperative Agreements.

In addition, Defendants state that they still want to pursue a counterclaim that hinges directly on whether the advice was biased or unbiased, good or bad, and had value or not.  In a final footnote, they propose to take discovery as to their own quantum meruit/valebat defense and

_____

[1] In January 2003, Harvard stated that its "core points" with respect to damages included:

i.      The facts establish that defendants' work in Russia had and continues to have tremendous value. . . .

ix.     It is not at all impossible to assess the value of the advisory services provided by HIID under the Cooperative Agreements.  The advice rendered by HIID was successfully and demonstrably tied to the carrying out of the specific tangible objectives expressly set forth in the Cooperative Agreements. . . .  The value of such advice is routinely assessed by experts and courts and can and should be assessed here.

Harvard Mem. Opp'n U.S. Mem. as to Damages at 4-5.

to prove:

*     Achievement by Harvard of the specific deliverables identified in each of the Cooperative Agreements;
*     Good faith and unbiased nature of all advice given by HIID's advisors on the Russia Project;
*     Absence of any causal nexus between Shleifer's and Hay's alleged investments and the advice given by HIID's advisors, including Shleifer and Hay, to the Russian Federation;
*     The fact that much of the advice provided by HIID during the Russia Project came from world-class professionals, who provided excellent and unbiased advice at a small fraction of market rates; and
*     Specific contributions to Russia's free-market economy (e.g., stock exchange; securities and exchange commission; vibrant and competitive mutual fund industry; vibrant and competitive specialized depository industry; etc.) resulting, at least in part, from defendants' work under the Cooperative Agreements.

Defs.' Mot. to Limit Damages Discovery at 12, n.5.

Thus, Defendants propose to take discovery and offer evidence on the very issues they ask the Court to bar the United States from taking discovery on or offering evidence about. Defendants cannot possibly be entitled to argue and prove that "[s]pecific contributions to Russia's free-market economy . . . result[ed], at least in part, from defendants' work under the Cooperative Agreements," id., without also allowing a jury to hear of the specific harm to that same economy that resulted, at least in part, from Defendants' conflicted advice in the areas of their own prohibited investments and self-dealing. Defendants cannot be permitted to show a "vibrant and competitive mutual fund industry," id., while excluding the evidence of the tainted and anti-competitive actions taken by Defendants and the resulting impact on the mutual fund and depository industry that Harvard contracted to help develop. Defendants cannot be permitted to argue that they changed the course of history with their stabilization and privatization program, without addressing the corruption, depression, and financial crisis that they caused.

B.     The Evidence Defendants Want Excluded Goes Directly to the United States'
       Case in Chief on Contract and FCA Damages

The evidence Defendants seek to exclude goes directly to the United States' expectation measure of breach of contract damages and its damages under the FCA.  Defendants do not deny that the United States is entitled to prove, as its breach of contract damages,  the difference in value between what it contracted for and what it received.  They also do not contend that consequential damages (even assuming that what the United States seeks are, in fact, consequential damages)[2] may not be recovered on a breach of contract claim.  Evidence of the difference in value between the impartial oversight for which the United States contracted and the tainted oversight it ultimately received logically includes the evidence the United States seeks to discover and introduce: evidence of the extent to which the prohibited conflicts affected the advice that was delivered in ways that in fact undermined rather than fostered the goals articulated in the Cooperative Agreements; evidence of the extent to which the prohibited conflicts undermined what the Project was supposed to accomplish when it erupted in scandal; and evidence of how the conflicts affected and poisoned the work of other contractors paid by the United States to take part in the broader effort that was to be spearheaded by Harvard.  All of those matters go to the United States' expectation measure of breach of contract damages.

This evidence likewise is admissible as to the United States' FCA damages.  By the plain

---

[2]The demarcation between consequential and other damages is a fact question.  <u>See United States v. Roby</u>, 79 F. Supp.2d 877, 895 (S.D. Ohio 1999), <u>aff'd</u> 302 F.3d 637 (6th Cir. 2002); <u>Mead Corp. v. McNally-Pittsburg Mfr. Corp.</u>, 654 F.2d 1197, 1207-08, 1211 (6th Cir. 1981);  <u>Platt Elec. Supply, Inc. v. Menlo Logistics, Inc.</u>, 2002 WL 31466490, *3 (D. Or. Mar. 19, 2002); <u>Roneker v. Kenworth Truck Co.</u>, 977 F. Supp. 237, 239 (W.D.N.Y. 1997); <u>Connecticut Printers, Inc. v. Baker Perkins PMC, Ltd.</u>, 1989 WL 107391, *2 n.3 (D. Conn.  May 11, 1989); <u>American Elec. Power Co. v. Westinghouse Elec. Corp.</u>, 418 F. Supp. 435, 459 (S.D.N.Y.1976).

statutory language, the United States' single damages under the FCA are, without limitation, all

of the damages the United States "sustain[ed] because of" the violations of the Act.  <u>See</u> 31

U.S.C. § 3729(a).  FCA damages are to be "'liberally calculated to ensure that they 'afford the

government complete indemnity for the injuries done to it.'"  <u>See</u> <u>United States ex rel. Roby v.</u>

<u>Boeing Co.</u>, 302 F.3d 637, 646 (6th Cir. 2002) (quoting <u>United States ex rel. Compton v.</u>

<u>Midwest Specialties, Inc.</u>, 142 F.2d 296, 304 (6th Cir. 1998) (quoting <u>United States ex rel.</u>

<u>Marcus v. Hess</u>, 317 U.S. 537, 549 (1943)).

       Courts have specifically recognized that false claims with respect an aspect of a

government-funded project can result in losses to the government with respect to money paid for

other components as well.  For example, in <u>Roby</u>, where the defendants sought to limit the

United States' recovery to the costs of a defective helicopter gear, rather than the costs of the

helicopter that the gear damaged, the Sixth Circuit held that the difference in value between what

was provided and what was received should be judged with respect to the damage to the entire

helicopter, not just the defective gears.  302 F.3d at 648-49.  Similarly, here the United States is

entitled to take discovery and prove that the entire Harvard Russia Project was damaged by the

prohibited conflicts and that the broader effort– involving United States funds paid to other

contractors directed by Harvard– was damaged as well.  If the effect of the "defective" (here

conflicted) Project managers was to diminish the value of the work of the Project as a whole and

to diminish the value of the work of other contractors, then the damage the Government

ing

"sustain[ed] because of" the violations includes those amounts.[3]  The United States can recover

for those amounts under the FCA, just as it can on its breach of contract claim.

      C.    The Evidence May Not Be Excluded as Unforeseeable, Speculative or Lacking in
            Causation.

      The United States should not be denied the discovery it needs to rebut the offset claim

and prove its FCA and contract damages based on a premature and unsubstantiated claim that the

damages the United States would ultimately seek to prove are unforeseeable, or were not caused

by Defendants' conflicts, or are overly speculative.  These are issues for a jury, after discovery.

The United States expects, after discovery, to offer more than sufficient evidence to demonstrate

specific negative consequences that actually and forseeably flowed from the Defendants'

corruption, self-dealing, and tainted advice.  In some cases, such as when USAID contractors

were directed to assist Elizabeth Hebert's business partner in the mutual fund business, the

damages were easily calculable and not only foreseeable, but obvious.  Time and effort for which

---

[3]Courts have also repeatedly rejected the suggestion made by defendants here that, notwithstanding the much broader statutory language, FCA damages are somehow limited to the sums the United States paid out to defendants upon the presentation of the false claims.  See, e.g., BMY – Combat Systems Div. of Harsco Corp. v. United States, 44 Fed. Cl. 141, 148-49 (Fed. Cl. 1998) (holding "costs of inspection and repair incurred by the government as a result of a contractor's false representation that a product passed inspection pursuant to the contract are recoverable as FCA single damages"); Daff v. United States, 31 Fed. Cl. 682, 695 (Fed. Cl. 1994), aff'd, 78 F.3d 1566 (Fed. Cir.1996) (after trial, awarding FCA single damages that included government's costs of disassembling, testing, and repairing product when contractor hid product's failure to pass required tests); United States v. Ekelman & Assoc., Inc., 532 F. 2d 545, 550-51 (6th Cir. 1976) (where defendants fraudulently obtained the United States' guarantees on mortgages and loans, affirming award of damages of amounts the United States had to pay mortgage holders upon default and also United States' expenses in maintenance and repair costs to preserve the mortgaged property); United States v. Woodbury, 359 F.2d 370 (9th Cir. 1966) (holding United States is entitled under the FCA to recover amounts expended "in the form of time and money spent by its employees in straightening out the mess . . .  and in protecting its interests thereafter."); see also, Roby, 302 F.3d at 658 (rejecting argument that FCA damages be limited to contract price).

the United States paid was diverted to Defendants' investment activities.  The United States expects to be able to prove that others at the time foresaw and warned against the negative consequences that in fact resulted from the conflicts here.  Indeed, Harvard's own experts, both those working on the Project and those whom Harvard has now hired, warned of the negative consequences that the United States will show ensued.  Defendants' one-sided arguments concerning general principles of damages recovery do not justify denying the United States discovery as to evidence that goes directly to Defendants' claim for offset and to the United States' case in chief for damages on its breach of contract and FCA claims.

Moreover, although Defendants now take a very limited view of foreseeability and causation, at the time of the events in question, they did not hesitate to take credit for developments in the Russian economy or their own role in shaping Russian history.  At the time, Andrei Shleifer explained his own role in the work of the Project and the critical role that his policy advice had played, in part, as follows:

> I decided to drop you a note to make sure one important point is not lost sight of, namely the role of the HIID project in policy advice. . . .

> Specifically, as part of the policy advice component of the project, Jonathan Hay, myself, and several other people associated with the project, have played a rather significant role in the design of both the Russian Privatization program and Russian stabilization of 1995.  In my opinion, policy advice has been from the start the critical, and perhaps the most important goal of the project, and I think we have done as much in this area as we could have possibly hoped for.

> Russia went through price liberalization in January of 1992, through privatization largely in 1992-94, and finally, through stabilization in 1995. . . .  These reforms have been the major accomplishment of the first Yeltsin administration, and are surely responsible - at least in part - for Yeltsin's victory in July.  **I have little doubt that these reforms have changed the history of Russia, and perhaps the world.**

9

We at HIID have been very fortunate to play a role in two of these reforms: privatization and stabilization.

For all of 1995, Maxim Boycko and I worked with Chubais on stabilization, through the Commission on Economic Reform.  As I am sure you are aware, this was a successful IMF supported stabilization program.  Stabilization required a great deal of rather technical work on the budget, the tax rules, IMF conditions, and so on.  In particular, IMF negotiations required the preparation of policy papers on a large number of specific issues, such as VAT, privatization plans of the government, the 1995 budget and budget rules, etc.  I was fortunate to play a role in this work.

**In sum, the HIID project has played a role in two of the most significant steps of Russia's transformation to a market economy.**

July 16, 1996 Letter from A. Shleifer to Louis Zanardi, Asst. Dir., General Accounting Office ("GAO"), Exh. A (emphasis added).

These past claims concerning the value of Defendants' work on this Project, like their continuing cause of action for offset, cannot be squared with Defendants' argument that any harm the United States might seek to attribute to the conflict-laden work actually done on the Project was not caused by developments on the Project and could not have been foreseeable.  Similarly, Defendants' charge that the United States' expected evidence of the harm they caused is overly speculative cannot be squared with their current claim to an offset for what they contend is the enormous value of their work.

D.     The Evidence May Not Be Excluded for Failure to Comply With Rule 9(g).

Finally, the Court should not bar the United States from pursuing discovery as to this evidence on the basis that the United States is seeking special damages it should have plead more fully under Fed. R. Civ. P. 9(g).   These damages have been more than adequately plead.

Defendants have all the notice of the United States' damages theory that Rule 9(g) is

meant to provide.  Rule 9(g) requires only that a plaintiff "state" any items of special damages it

seeks, <u>see</u> Fed. R. Civ. P. 9(g), so that a defendant is put "on notice that damages other than those

which he is presumed to expect are being sought."  <u>See</u> <u>Diaz Irazarry v. Ennia, N.V.</u>, 678 F.

Supp. 957, 959 (D.P.R. 1988).  The purpose of requiring that special damages be plead in a case

such as this "is to protect the defendant against being surprised <u>at trial</u> by the extent and character

of the plaintiff's claim."  5A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and</u>

<u>Procedure 3d</u> § 1310 (emphasis added).  Accordingly the statement of special damages being

sought is meant to "put the defendant on notice and<u> permit the most advantageous employment</u>

<u>of the discovery procedures</u> in preparing a defense to the claim for special damages."  <u>Id.</u>

(emphasis added).

 The damages the United States seeks are amply plead in the Complaint, the Amended

Statement of the United States' Claims, and the United States' thirty-page summary of expected

damages evidence, all of which have been provided to Defendants prior to any damages

discovery in this case.  For example, the first few paragraphs of the Complaint state:

> 1.  The United States alleges that Harvard University ("the President and Fellows of Harvard College" or "Harvard") and its employees, Andrei Shleifer and Jonathan Hay, defrauded the United States out of at least $40 million dollars paid to Harvard to provide impartial and unbiased advice in connection with a United States' assistance program in Russia.  The United States alleges that Shleifer and Hay abused their positions as high-level and trusted advisors to and on behalf of the United States in Russia, and misused resources funded by the United States for their own personal benefit and the personal benefit of their wives, girlfriends and/or business associates.  Harvard, which was paid by the United States to provide impartial and unbiased administration and oversight of the assistance program in Russia, failed in its obligation to provide such oversight, and instead mismanaged and abused the resources entrusted to it by the United States.   As a result of Defendants' misconduct, the United States suspended and ultimately terminated the Harvard project in Russia.

2.  The United States alleges that Defendants' actions undercut the fundamental purpose of the United States' program in Russia -- the creation of trust and confidence in the emerging Russian financial markets and the promotion of openness, transparency, the rule of law, and fair play in the development of the Russian economy and laws. . . .

Complaint ¶¶ 1-4.  The Complaint lists many of the specific elements of damages that the United States has stated it intends to prove here.  See, e.g., Complaint ¶¶ 84-86, 98.  In addition, from the moment that they asserted their own claims for offset, Defendants had notice the damages phase of this case would involve discovery, evidence, and ultimately findings on the value of the work of Harvard as actually delivered.  Finally, any lack of notice at the pleadings stage has been cured by the United States' summary of its expected damages evidence, which forms the basis for the motion before the Court now.   Defendants indisputably have the pre-trial and pre-discovery notice of the United States' claimed damages that Rule 9(g) is meant to provide.

## II.   DEFENDANTS OFFER NO BASIS FOR DENYING THE UNITED STATES DISCOVERY AS TO A RELIANCE MEASURE OF DAMAGES.

Defendants also argue that the United States should be barred from taking discovery as to what they label the United States' "general taint" theory.  They actually seek to exclude all the evidence as to the value of unconflicted advice to the United States; the United States' unwillingness to accept conflicted and self-dealing advice; and the nexus between the work of Shleifer and Hay on the Project and their prohibited investments.  See Defs.' Mot. to Limit Damages Discovery at 6 (seeking to exclude damages set forth at U.S. Prelim. Description of Expected Damages Evidence 6-11 "Amounts Paid By USAID In Reliance Upon False Representations of Lack of Conflicts and Self-Dealing").  They cite no authority for precluding the evidence the United States seeks to discover and introduce.  Contrary to Defendants'

suggestion, when the Court denied the United States' motion for partial summary judgment on damages, the Court did not reject for all time the United States' claim to damages based on the fact that it bargained for conflict-free services and would not have paid for the conflicted services that Defendants' delivered.  Cf. Tr. 9/9/04 at 3 (denying per se approach to damages on summary judgment).  To the contrary, the Court indicated that discovery would be needed to explore those issues, among others.  See Tr. 9/9/04 at 13 (indicating discovery needed to explore issues of "what the work of the project was and how much was related to Shleifer and Hay and/or their investments and how much wasn't, which would basically be an allocating of the money that was spent on the project").  As set forth in the United States' Supplemental Statement As to Damages Case, evidence that the United States did not bargain for the conflicted advice it received and would not have paid for conflicted advice is central to the United States' claim for damages in this case.  See id. at 5-6.  The United States is certainly entitled to take discovery and offer evidence about this and the very issues the Court has already determined are at issue – how the work of the Project was carried out by Shleifer and Hay and the close nexus between that work and their prohibited investments.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that Defendants' motion be denied.

Respectfully submitted

MICHAEL J. SULLIVAN
United States Attorney

 /s/ Sara M. Bloom
SARA M. BLOOM

Assistant U.S. Attorneys
9200 John Joseph Moakley U.S. Courthouse
Boston, MA  02210
(617) 748-3265

/s/ Sara McLean
PETER D. KEISLER
Assistant Attorney General

MICHAEL F. HERTZ
MICHAEL GRANSTON
ALICIA J. BENTLEY
SARA MCLEAN
U.S. Department of Justice
Ben Franklin Station, P.O. Box 261
Washington, D.C. 20044
 202-616-9854

February 14, 2005

14